## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

United States of America
*ex rel.* Ferdinand F. Becker, M.D.,
and Linda Wildes,

      Relators,

vs.

Donald Collier Proctor, Jr., M.D.;
Proctor, Baggett & Yoon, M.D., P.A.;
Face Center of Vero, PLC;
Grove Place Surgery Center, L.L.C.; and
ENT Properties, L.L.C.;

      Defendants.

Civil Action No. _____

**\*FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(b)(2)**

-------------------------------------------------------------------------------------------------------------

### FEDERAL CIVIL FALSE CLAIMS ACT COMPLAINT
### AND REQUEST FOR JURY TRIAL

1.    Ferdinand F. Becker, M.D. and Linda Wildes (hereinafter "Relators"), hereby bring this action on behalf of the United States of America against all Defendants for treble damages and civil penalties arising from Defendants' false statements and false claims submissions in violation of the federal Civil False Claims Act, 31 U.S.C. §3729 et seq., as amended by the Fraud Enforcement & Recovery Act of 2009:

### INTRODUCTION AND SUMMARY OF THE FRAUD

2.    For over thirteen (13) years, Donald Collier Proctor, Jr., M.D., an otolaryngologist, facial plastic surgeon and Mohs surgeon in Vero Beach, Florida, has been conducting medically unnecessary Mohs surgeries in order to enrich himself and defraud the Medicare Program.

3.    In gross abuse of his position of authority as a medical doctor, Dr. Proctor has systematically deceived thousands of vulnerable, elderly patients into believing that they have multiple skin cancers which, in fact, they very frequently do not have.

1

4. Because each patient frequently presents to his medical office with at least *one* legitimate skin cancer or suspect lesion on his or her face—in most cases, the cancer or lesion for which a dermatologist or other physician has referred the patient to Dr. Proctor for evaluation—it is not difficult for Dr. Proctor to prey on patient anxiety by claiming that there are additional cancerous or suspect lesions that must be removed. He then performs the unnecessary Mohs surgeries on them.

5. During this period of over thirteen (13) years, Dr. Proctor has seen an average of four-and-a-half (4.5) Mohs surgery patients per day, four (4) days per week (usually Monday through Thursday). Based on a conservative estimate, Dr. Proctor has been performing an average of six (6) Mohs surgeries on each of these patients: an average of two (2) that were necessary, and another four (4) that are unnecessary.

6. This conservative estimate factors in the astonishing fact that, approximately once a week, Dr. Proctor also would "work up" a case in which he performed an average of approximately twelve (12) Mohs surgeries on a patient, and is based on other facts and observations, as detailed below.

7. A Mohs surgeon normally would not be in a position to perform more than five (5) Mohs surgeries per patient in one day; lesions usually do not form on patients in those high numbers prior to the patients' presentation to the Mohs surgeon.

8. Dr. Proctor is also routinely billing Medicare for three to four (3-4) stages (i.e., levels) of Mohs surgery for the vast majority of Mohs surgeries allegedly performed. (Medicare separately reimburses for each stage of Mohs surgery performed in removing cancer. Hence, the more stages of Mohs surgery that are performed, the higher the reimbursement from Medicare.)

9. This is also far outside the norm, which is for approximately 1.5 stages of Mohs surgery.

10. Dr. Proctor is carrying out these additional stages on purpose: he intentionally makes shallow cuts into the skin cancer (or non-cancerous skin), often before any debulking has taken place (removal of as much of it as possible, i.e., the initial surgical step of removal of the bulk of it), which leaves tissue with positive margins (or other non-cancerous skin) that unnecessarily needs further excision (i.e., a 2nd, 3rd or 4th stage).

11. In contrast, most ethical Mohs surgeons—who follow the standard of care and Medicare regulations—would first debulk the skin cancer to remove a large part of it. (There is not

2

an allowable Mohs surgery/Medicare charge for debulking.)  Only after debulking would the first stage of Mohs surgery commence, and would be concluded in that first stage or, if necessary, in a second stage, by making appropriate excisions.  It is the rare case that should require three or more stages.

12.     Furthermore, Dr. Proctor is also greatly enriching himself and enhancing the Government's losses by billing for medically unnecessary skin flaps to allegedly close up surgical defects left by the surgeries, along with the Mohs surgeries.

13.     Dr. Proctor is also charging expensive surgical center fees, primarily by falsely describing a defect as being two noncontiguous defects, thus needing two flaps, and then charging two surgery center fees.  In truth, they are contiguous in the vast majority of cases, or the second defect is non-existent, and the second surgery center fee is thus fraudulent.

14.     Of course, surgery center fees are also fraudulent, in the first place, when charged for any Mohs surgery or flap that was not medically necessary, and Dr. Proctor very frequently billed for surgical center fees in tandem with Mohs surgeries.

15.     Relators possess written evidence—copies of surgical, consultation and Mohs reports, as well as explanations of benefits ("EOBs")—which clearly shows that Dr. Proctor is using very sloppy, illogical, fraudulent medical documentation to conceal the fact that he is not performing the multi-stage Mohs surgeries he has claimed to have performed.

16.     These medical reports are simply incredible.  For example, he has described allegedly large cancerous lesions, large defects left by the surgeries, and large skin flaps to close those claimed defects, that could not possibly have existed or been performed:  there is insufficient tissue in the areas of the face at issue to do so.

17.     In addition, it is impossible that Dr. Proctor could have accomplished these complex, time-consuming procedures during the time periods he allotted for them, as explained below.

18.     Mohs surgery—more specifically, Mohs micrographic surgery—was pioneered by Dr. Frederic Mohs and is widely used.

19.     The performance of Mohs surgery requires cutting patients' faces with a surgical knife. Dr. Proctor is taking a scalpel to a patient's face each and every time that he

3

unnecessarily commences Mohs surgery, and/or a stage thereof—dozens of times every week.

20. Mohs surgery is a specialized surgical procedure used to remove high-risk skin cancers and/or those in functionally or cosmetically sensitive areas. There are many lower-cost, less elaborate modalities for the treatment and/or removal of less problematic lesions. Mohs surgery requires a specially trained physician and laboratory.

21. The tumor is removed with narrow margins and specifically inked to a corresponding map of the patient. The specimen is then prepared with horizontal, or *en-face*, frozen sections for the surgeon to evaluate while the patient remains in the office. The frozen-sectioning technique allows the physician to evaluate the entire margin and avoids the false negatives sometimes associated with standard excisional processing.

22. The Mohs surgeon, who also acts as the pathologist, then marks the areas corresponding to positive margins on the map. Maintaining orientation, the surgeon takes additional stages, if necessary, from only those areas histologically found to be positive, until clear margins are obtained. The resulting defect, or wound, is then closed.

## THE PARTIES

23. The **United States of America** (hereinafter "the Government") funds the provision of medical care, including services for eligible citizens through Medicare, Medicaid, CHAMPUS, and other agencies and programs (hereinafter "Government programs").

24. Relator **Ferdinand F. Becker, M.D.** is a medical doctor licensed by the State of Florida. He specializes in facial plastic surgery.

25. Dr. Becker has substantial expertise in Mohs surgery—both from performing it for numerous years and from publishing scholarly articles.

26. After turning the focus of his practice to facial plastic surgery, Dr. Becker referred a number of patients to Dr. Proctor for Mohs surgery. Because these patients were also Dr. Becker's patients, Dr. Proctor reported back to Dr. Becker concerning the Mohs surgeries that were performed on them. Consequently, Dr. Becker has many of the medical and billing records concerning those patients' treatment by Dr. Proctor—which Dr. Becker has studied extensively. Dr. Becker also has followed up with several of these patients by asking them about the procedures that were actually performed, and the defects that were left. Hence, Dr. Becker has inside knowledge of the allegations set forth herein.

4

27.   Dr. Becker resides at 507 Bay Drive, Vero Beach, Florida 32963. Dr. Becker's office is located at 5070 North A1A, Suite A, Vero Beach, Florida 32963. His home address is 507 Bay Drive, Vero Beach, Florida 32963.

28.   Relator **Linda Wildes** was employed as Dr. Proctor's histology technician from January 1998 through April 2006. She assisted Dr. Proctor in that capacity with virtually all Mohs surgeries he performed during that time period. Hence, she also has inside knowledge of the allegations set forth herein.

29.   Ms. Wildes resides at 7650 Norwood Avenue, Melbourne, Florida 32904.

30.   Defendant **Donald Collier Proctor, Jr., M.D.** is a medical doctor licensed to practice medicine in the State of Florida. He specializes in otolaryngology, facial plastic surgery, and Mohs surgery. (Otolaryngologists are often referred to as ear, nose and throat doctors ("ENTs"). It is not uncommon for Mohs surgeons to be ENTs.) He resides at 2205 East Ocean Oaks Lane, Vero Beach, Florida 32963.

31.   Defendant **Grove Place Surgery Center, L.L.C.** is an active Florida limited liability company, with a principal business address of 1325 36th Street, Suite B, Vero Beach, Florida 32960. This is the surgery center where Dr. Proctor performed many of the fraudulent Mohs surgeries, as well as many of the post-Mohs-surgery facial reconstructions. Dr. Proctor is the sole owner, official manager and member of the surgery center. The surgery center is adjacent to Dr. Proctor's medical office, which is described immediately below.

32.   Defendant **Proctor, Baggett & Yoon, M.D., P.A.** is an active Florida profit corporation with a principal business address of 1325 36th Street, Suite A, Vero Beach, Florida 32960. This is Dr. Proctor's medical practice. The corporation has four owner, officers and directors: Dr. Proctor, Kathleen M. Baggett, M.D., Alex H. Yoon, M.D., and Jeffrey A. Livingston, M.D. Although Proctor, Baggett & Yoon, M.D., P.A. is named as a defendant in this *qui tam* Complaint, that was only done because many of the false claims at issue were submitted for reimbursement under this corporation's name; that is, Relators have no knowledge of any wrongdoing, and have not alleged any wrongdoing whatsoever, on the part of Drs. Baggett, Yoon, and Livingston. Notably, Drs. Baggett, Yoon, and Livingston have no ownership interest in Grove Place Surgery Center, L.L.C.

5

33. Defendant **Face Center of Vero, PLC** is an active Florida limited liability company with a principal business address of 1325 36th Street, Suite A, Vero Beach, Florida 32960. As noted above, this is the location of Dr. Proctor's medical practice, Proctor, Baggett & Yoon, M.D., P.A. Dr. Proctor is the sole owner, officer and director of Face Center of Vero, PLC.

34. Defendant **ENT Properties, L.L.C.** is an active Florida limited liability company, with a principal business address of 1325 36th Street, Suite A, Vero Beach, Florida 32960. This location is Dr. Proctor's medical practice. This LLC has three managers/members: Drs. Proctor, Baggett and Yoon. ENT Properties, L.L.C. is named as a defendant in this *qui tam* Complaint only because of its physical relationship with the other Defendants' businesses; Relators have no knowledge of any wrongdoing, and have not alleged any wrongdoing whatsoever, on the part of Drs. Baggett and Yoon.

## JURISDICTION, VENUE AND PRIOR DISCLOSURE

35. Relators have previously submitted to the Attorney General of the United States and to the U.S. Attorney for the Southern District of Florida a statement of all material evidence and information related to the Complaint. The Disclosure Statement is supported by material evidence known to the Relators. The Disclosure Statement and all referenced documents are confidential, and are protected by the attorney-client privilege, the work product doctrine, the common interest privilege, and the joint prosecutorial doctrine.

36. Relators are original sources of the information set forth in this Complaint, and have direct and independent knowledge of the allegations set forth herein.

37. All Defendants transact business in this District, and the actions set forth herein occurred in this District. Therefore, this Court has jurisdiction over this case under 31 U.S.C. § 3732(a), 28 U.S.C. § 1345, and 28 U.S.C. § 1331.

38. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) for the reasons set forth immediately above.

## DETAILED ALLEGATIONS

### A. MOHS SURGERY

39. Mohs micrographic surgery (aka "Mohs surgery") is a specialized technique for the removal of skin cancer, and is reserved for particular types of skin cancers, including skin cancers that have recurred following previous treatment, cancers that are at high risk of

6

recurrence, cancers located in specific areas of the body, large tumors, and neurotropic lesions. It is most commonly used to remove basal cell carcinoma ("BCC") and, much less frequently, squamous cell carcinoma ("SCC").

40. BCC and SCC are both types of non-melanoma skin cancer ("NMSC"). NMSCs most frequently occur on the head and neck.

41. The surgical procedure has also been used to remove melanoma and other malignancies of the skin and mucous membranes. Mohs surgery is a tissue-sparing procedure, with the objective of fully removing the cancer with as little loss of skin as possible. Thus, it may allow a more cosmetically aesthetic or functional post-surgical result, in specific areas, than other treatment modalities.

42. Historically, Mohs surgery is often performed by dermatologists because of their expertise in skin cancer pathophysiology, cutaneous histopathology, and dermatologic surgery, including their ability to repair defects. ("Defect" means the surgical wound created by the removal of the specimen.)

43. Training programs in Mohs surgery are available throughout the U.S. via a one (1) or two (2)-year post-residency fellowship. In 2003, the Accreditation Council for Graduate Medical Education approved procedural dermatology fellowships in which Mohs surgery is often the fellowships' centerpiece.

44. Mohs surgery is usually performed in a medical office properly equipped for the procedure. (It need not be performed in a specialized outpatient surgical facility.) The procedure may take several hours, depending on the extent of the cancer. If facial reconstruction is needed (e.g., a flap) after the Mohs surgery, a lot of additional time is needed.

45. Mohs surgery is a meticulous technique that provides complete microscopic margin control through the taking of horizontal frozen histological sections of the surgical margins of the excised tumor, for the most complete microscopic examination possible. It requires a physician trained in Mohs surgery and pathology to accurately excise and map tumor extensions.

46. The surgery is performed in stages (or "levels") in which the physician removes a single layer of tissue, and performs additional stages, if necessary for each stage, to clear the

7

area of cancer. (A "stage" or "level", in Mohs surgery, is an individual excision in which tissue is removed from the patient, oriented, processed, and microscopically reviewed.)

47. After each stage of Mohs surgery, the physician examines the excised skin with a microscope for the presence of cancer, acting in a dual role as surgeon and pathologist. Only if cancer remains present should the physician proceed to the next stage of removing additional tissue.

48. The goal of Mohs surgery is excision of cutaneous and mucosal malignancies with maximal cure rates and tissue sparing.

49. Mohs surgery is not the only way of treating skin cancer and other cutaneous tumors, which may be treated successfully by standard fusiform excision, cyrotherapy, radiation therapy, curettage and electrodessication, intralesional interferon, topical and intralesional 5-fluorouracil, and ablative laser treatment. These alternative methods can provide excellent results.

50. Mohs surgery is indicated in situations where other treatment modalities have failed. The Mohs technique is used for recurrent tumors or those at high risk for recurrence, those with clinically indistinct margins, and for those tumors that are anatomically located where tissue conservation is important. Such locations include the eyelids, ears, nose, lips, and fingers.

51. Because Mohs surgery is not the exclusive way to treat skin cancer, under Medicare regulations, Mohs surgery is deemed medically reasonable and necessary *only if* performed based on certain current, accepted diagnoses and indications. Medicare separately reimburses for each stage of Mohs surgery performed in removing cancer. Hence, the more stages of Mohs surgery that are performed, the higher the reimbursement from Medicare.

52. Although Mohs surgery is not a high-risk form of surgery, it is not without its significant risks. Caution must be taken to ensure that the vital dyes are pure and sterile, to minimize the risk of placing infected material into the surgical site. Mohs surgery frequently may involve the nasal, buccal, conjunctival, and anogenital mucosa. Proper stabilization, exposure, and instrumentation are essential when working on nasal or oral mucosa to ensure access and hemostasis, and thereby prevent uncontrollable bleeding and aspiration of blood. Further, muscle is commonly encountered during Mohs surgery.

Facial muscle lies just below the dermis, often separated by a thin band of connective tissue and little or no fat. Conservation of function is important for muscle groups. To minimize unnecessary muscle damage, the Mohs surgeon must attempt to split muscles and take only superficial portions for evaluation.

53.  Similarly, nerve tissue is commonly encountered during Mohs surgery. Sacrifice of motor nerves can be debilitating, disfiguring, and distressing. Care must be taken to protect named nerves—although these may have to be removed if there is tumor involvement.

54.  As with other forms of surgery, anesthesia poses its own set of risks. Mohs surgery may require several hours to complete; injecting a mixture of short- and long-acting local anesthetics, such as lidocaine and bupivacaine, imparts more prolonged anesthesia and enhances patient comfort. To further reduce intraoperative pain, some surgeons apply lidocaine jelly for EMLA topical anesthetic on the wound between stages. Cutaneous and mucosal Mohs surgery is usually performed under local anesthesia, using a combination of direct infiltration and regional nerve blocks. Lingual, laryngotracheal, esophageal, and anogential surgery may require conscious sedation or general anesthesia.

**55.**  Mohs surgery may also leave a scar. In many cases, however, there is little or no scarring.

### B.  MOHS SURGERY FRAUD BY DR. PROCTOR

#### 1.  Relators' Relationships with Dr. Proctor, and with Each Other

56.  Ms. Wildes worked as a Mohs surgery histology technician for co-Relator, Dr. Becker, from 1993 through 1997, in the same job capacity that she subsequently performed for Dr. Proctor. The name of the business was Becker & Stubbs M.D. P.A., but the Mohs practice constituted only part of the medical practice's areas of service. (Dr. Stubbs did not perform Mohs surgery.)

57.  During 1997, Dr. Proctor worked a fellowship with Dr. Becker. During that time, Ms. Wildes was Dr. Becker's histology technician. Hence, there was a period of time in which Drs. Becker and Proctor, and Ms. Wildes, all worked together. But Dr. Becker left that practice at the end of 1997, and Dr. Proctor took over in January 1998 as sole practitioner of the Mohs surgery practice.

58.  Ms. Wildes, as a histology technician, subsequently worked for Dr. Proctor, from January 1998 through April 2006—some eight (8) years and three (3) months.  Also subsequently, Dr. Becker periodically referred Mohs patients to Dr. Proctor.

59.  Ms. Wildes proceeded to work for Dr. Proctor four days a week (normally Monday through Thursday).

60.  During each of those four days per week, Dr. Proctor saw an average of four-and-a-half (4.5) patients every day, and *nearly every* patient underwent Mohs surgeries.

61.  Ms. Wilds acted as the histology technician in virtually all of these cases.

62.  Normally, these patients became patients of Dr. Proctor's as a result of a referral from a dermatologist or another physician.   (In some cases, Dr. Proctor took the original biopsy.)

63.  Although Ms. Wildes worked for Dr. Proctor through April 2006, she has no reason to believe that Defendants ceased from false claims submissions after that date.  Indeed, another employee of Defendants' confirmed to Ms. Wildes that the fraudulent activities continued thereafter.

64.  Upon such information and belief, and by examination of other records (e.g., EOBs), it is specifically alleged that the fraudulent acts set forth herein have continued through the present, and will continue into the future unless Government action is taken.

### 2.    Medicare

65.  At all relevant times herein, Dr. Proctor has been a participating physician in the Medicare Part B Program.

66.  The vast majority of Dr. Proctor's patients—over eighty percent (80%)—are over the age of 65 and are Medicare beneficiaries.

67.  Dr. Proctor agreed—among other things—to accept reimbursement of eighty percent (80%) of the Medicare allowable charges as payment from Medicare, to not charge his patients any more than the remaining twenty percent (20%) of Medicare allowable charges, and to file claims only for services that were rendered, reasonable, and medically necessary.

68.  Medicare local medical review policy requires—among other things—that a physician who claims payment for performing Mohs surgery document in the patient's medical

record the necessity of the surgery, include in the medical record a pathologic description of the slides, and retain all slides.

69.    Dr. Proctor electronically submitted claims (completed "HCFA 1500s") to the Medicare Part B Program through Proctor, Baggett & Yoon, M.D., P.A., Grove Place Surgery Center, L.L.C, and one or more additional Defendants.

70.    Dr. Proctor agreed in his electronic enrollment form application with Medicare, among other things, that he would be responsible for all Medicare claims submitted to HCFA/CMS relating to Dr. Proctor's services, whether submitted personally by Dr. Proctor, or by his employees or agents, and that he would submit claims that were accurate, truthful and complete, and based on medical services that were reasonable and necessary.

71.    However, they were not accurate, truthful, complete, reasonable or necessary-- as set forth herein.

### 3.    CPT Codes

72.    The CPT book specifies as follows for the primary CPT codes involved with Mohs surgery, which Dr. Proctor utilized for billing Medicare:

17304    Mohs micrographic surgery, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and complete histopathologic preparation, including the fist routine stain (e.g., hematoxylin and eosin, toluidine  blue); first stage, fresh tissue technique, up to 5 specimens

17305    second stage, fixed or fresh tissue, up to 5 specimens

17306    third stage, fixed or fresh tissue, up to 5 specimens

17307    additional stage(s), up to 5 specimens, each stage

17310    (This is a CPT add-on code.) Each additional specimen, after the first 5 specimens, fixed or fresh tissue, any stage.  (17310 must be used with 17304-17307.)

Please note that 17304, 17305, 17306 and 17307 are modifier -51 exempt.

73.     CPT Code 17304 is used for Mohs surgery when tumor selection criteria are met and the Mohs surgeon acts as surgeon and pathologist. If Mohs surgery is performed on the same day as the E/M services, a -25 modifier is to be used with the appropriate E/M code. If an unrelated major surgical procedure was performed in addition to the Mohs surgery, a -57 would be attached to the E/M code instead of the -25.

74.     As suggested above, the following surgical and laboratory procedures are bundled into the 17304 code: clinical evaluation of tumor margins, outlining of tumor margins with skin-marking pens, reference-mark placement, local anesthesia of the tumor area, "debulking" of the tumor, surgical excision of the first stage (layer, or level), division of the specimen into smaller sections (if done), chroma-coding of all sections, mapping, embedding, cutting, and staining of the histopathology slides, complete microscopic slide evaluation, and transfer of the histologic findings to the Mohs map.

75.     If the margins of the first stage are clear of cancer, and if the defect will be allowed to heal by secondary intention, hemostasis, bandaging, and post-operative instructions are also bundled with code 17304.

76.     The excision of the first layer of tissue may be totally embedded ("TE") and processed as a single specimen ("Tex1"), or may be of a size or complexity requiring division into multiple smaller sections.

77.     Dividing the specimen into five or fewer sections is bundled within code 17304. No matter how many cuts are put on a slide or how many slides are made, these are all bundled into code 17304.

78.     When the specimen removed in the first stage, or any subsequent stage, is so large and/or complex that it requires division into more than five sections, for each section over five, one unit of code 17310 is applied. All the units, from all of the stages where the removed tissue was divided into more than five specimens, are added together. Aside from code 17310, there is no other coding or compensation for removing a large specimen, deep specimen, or complex specimen as part of any single Mohs stage. H & E staining and/or toluidine blue staining are also bundled within code 17304, as noted above. Use of immunohistochemistry, such as cytokeratin for squamous cell carcinoma or S-100 for melanoma, and others, may be billed separately under code 88342.

12

79. If more than one separate tumor is appropriately treated using Mohs excision on the same date of service, each tumor is billed separately using Mohs codes 17304 through 17310. If the stage-1specimen is not clear of cancer, one or more additional stages will need to be excised until clear margins are obtained. These additional stages are coded as 17305 for stage 2, 17306 for stage 3, and 17307 for stage 4 and all subsequent stages; the number of stages after stage 3 are added and the total applied as a multiplier with code 17307.

### 4. Wildly Unnecessary Mohs Surgeries, Stages Thereof, Facial Reconstructions ("Flaps") and Surgical Center Fees

#### a. Excessive Number of Mohs Surgeries

80. Dr. Proctor, directly and through the other named Defendants, has been conducting medically unnecessary Mohs surgeries for at least the last thirteen (13) years.

81. In gross abuse of his position of authority as a medical doctor, he has systematically deceived thousands of vulnerable, elderly patients into believing that they have multiple skin cancers which, in fact, they very frequently do not have. He then performs the Mohs unnecessary surgeries on them.

82. Because each patient frequently presents to his medical office with at least *one* legitimate skin cancer or suspect lesion on his or her face—in most cases, the cancer(s) or lesion(s) for which a dermatologist or other referring physician has referred the patient to Dr. Proctor for evaluation—it is not difficult for Dr. Proctor to prey on patient anxiety by claiming that there are additional cancerous or suspect lesions that must be removed.

83. In other words, Dr. Proctor's *modus operandi* has been to routinely take patients who are in need one (1)—or at most two (2)—Mohs surgeries, schedule those surgeries, but perform additional (more than 1 or 2) multiple-stage Mohs surgeries on them after misleading the patients. He would perform the additional Mohs surgeries even though there had been no biopsies performed that showed their need.

84. Under the standard of care, Mohs surgery is normally performed only after a preliminary biopsy is done, is sent off to a lab, and is proven to be skin cancer (most frequently BCC; much less often, squamous cell carcinoma).

85.   If the clinician suspects a BCC, a skin biopsy should be performed. Either a shave or punch biopsy is appropriate based upon specific considerations.

86.   A major part of Dr. Proctor's *m.o.* is that he often "finds" a second, third or more lesions that he describes as crusty and/or irritated and in need of excision. He often claims they are cancerous. He then sends the first slide off to the pathologist, to obtain a tissue diagnosis. But he conducts the Mohs surgery any way, prior to getting the reading from the pathologist.

87.   Dr. Proctor sent biopsies to Dr. Virginia White and, later, to Dr. Neil Medalie.

88.   Neil S. Medalie, M.D. works at Pathology Associates of Indian River, 3790 7th Terrace, Suite 102, Vero Beach, FL 32980.

89.   In 2003 or 2004, Dr. Medalie came to Dr. Proctor's office with his wife, Mary, who works with him, because he did not understand why he was getting such a high volume of biopsy slides, and sought to inquire with Dr. Proctor about the matter. Dr. Medalie's office was very close to Dr. Proctor's, a few blocks away, down 37th Street.

90.   Dr. Medalie asked Ms. Wildes why he was receiving so many slides, and Ms. Wildes answered that they were lesions that Dr. Proctor sees and performs biopsies of, that are then sent to him for confirmation. But of course, Dr. Proctor should have awaited the pathologist's diagnosis prior to performing the surgeries.

91.   The existence of a biopsy-proven or suspect BCC (or other NMSC) does not necessarily mean that Mohs surgery is the proper treatment modality. Mohs surgery, which is more elaborate and expensive than other treatment modalities, is a specialized surgical procedure mostly used for the removal of high-risk skin cancers and/or those in functionally or cosmetically sensitive areas.

92.   The relatively simple, less expensive alternative to Mohs surgery, of electrodessication and curettage ("ED&C"), is the most common treatment method used by dermatologists for low-risk, primary, non-infiltrative BCCs < 1.5 cm in diameter. Furthermore, excisional surgery of selected BCCs can offer excellent results when appropriate margins are used.

93.   Indeed, a procedure may not be needed at all. Given the slow growth of most BCCs, it is acceptable to monitor a lesion with low clinical suspicion when a biopsy is not an ideal choice because of location or patient preference. In this case, the lesion should be

14

monitored every 3 to 6 months. Any change in the lesion should prompt a biopsy. In general, skin biopsies are quick and well tolerated procedures and should be performed when warranted by clinical suspicion.

94. In a Mohs surgery practice, each time the surgeon removes a stage/level, the histology technician makes a frozen-section slide of the margins for the physician.

95. The physician uses that frozen-section slide to determine whether there is malignancy, and to determine whether any additional stages need to be performed.

96. In Dr. Proctor's office, each skin lesion for each patient was labeled with a letter. If a patient had three lesions, for example, there would be lesion A, lesion B, and lesion C.

97. As there was an average of six (6) lesions and Mohs surgeries per patient, there was, on average, a lesion A, B, C, D, E and F.

98. In approximately one case every week, Dr. Proctor developed the patient's medical situation into an absurdly huge case in which there would be approximately *ten to twenty* different alleged lesions that were being worked on, as opposed to the one or two legitimate lesions that the patients actually had. That is, approximately once a week, Dr. Proctor would "find", and perform Mohs surgery on, a lesion J (10th), K (11th), L (12th), M (13th), N (14th), O (15th), P (16th), Q (17th), R (18th), S (19th) and/or T (20th)—each one representing a separate Mohs surgery—which is stunning not only in and of itself, but also because each referring dermatologist, as noted above, generally had only identified one or two lesions for Dr. Proctor to address.

99. It was in approximately November 2005, when Ms. Wildes' right arm and shoulder started hurting badly (partially from the very large number of slides she manually cut each work day with the microtome), that Dr. Proctor started to substantially increase the number of Mohs surgeries (performing the weekly cases that were absurdly huge).

100. But the number was always high, even before that—and Lisa Shipley, the registered nurse who has worked with Dr. Proctor since approximately 2004, often would roll her eyes at Ms. Wildes when Dr. Proctor told either of them or the patient that such a high number of Mohs surgeries was needed.

101. But on average, *including* the absurd weekly cases involving ten (10) to twenty (20) Mohs surgeries, and looking at the *entire* period of time that Ms. Wildes worked for Dr. Proctor, Dr. Proctor expanded an average of two (2) lesions, as originally referred and/or

15

scheduled, into an average of six (6) Mohs surgeries. To be clear, he did not do this for one patient each week; he did it for *all or virtually all* patients: an average of 4.5 per day, 4 days per week. All of the extra lesions—as many as approximately eighteen (18) in the most absurd of cases—are medically unnecessary.

102.   It is important to note that the vast majority of these patients were elderly, and/or disabled in some way, and that Dr. Proctor was detaining them for often three to five hours in order to conduct the unnecessary surgeries.

103.   These patients waited in the waiting room, then underwent the first level of Mohs surgery, returned to the waiting room where they often waited for an hour or more (while Ms. Wildes prepared the slides and Dr. Proctor reviewed them), then returned to the surgery room for the second-level surgery, returned to the waiting room for the same thing, and so on. Four to five patients per days were undergoing this back-and-forth process.

104.   Among those patients that were not referrals from dermatologists or other physicians, there were patients whom Dr. Proctor had seen before. They would return because of a concern, and Dr. Proctor would say something like, "This looks suspicious. I'll biopsy that myself."

105.   Dr. Proctor would sometimes comment to Ms. Wildes, Bonnie Watson and/or Lisa Shipley, R.N., as justification for performing additional Mohs surgery(ies) on a patient, that he saw a suspicious discoloration or blemish near the lesion for which the patient had been referred to him.

106.   Sometimes Dr. Proctor also would state that he would not want to use any of that suspect tissue to close up the previously performed Mohs defect.

107.   He would then proceed to perform the additional Mohs surgery(ies) there.

108.   Since the objective of Mohs surgery is to clear the margins, it should not be the case that nearby tissue is of concern for closing up the defect. The margins of the defect should be clear in the first place, as a result of properly performed Mohs surgery on the initial lesion.

109.   At least weekly, Ms. Shipley also made comments to Ms. Wildes in the break room or elsewhere, like "I can't believe what he's doing!" Ms. Wildes also frequently made such comments to Ms. Shipley.

110.    Such comments were also made by employees in the billing section of the office: by Gail, Marianne, and Suzette (last names unknown), particularly towards the end of Ms. Wildes' employment there. They looked at some patient bills and stated, essentially, "This Mohs work...how do we collect these bills? They're enormous."

111.    Also, patients sometimes called the office and complained about their shares of the Mohs surgery bills. One stated, essentially, "My open-heart surgery last year wasn't as expensive as getting these cancers removed from my face."

b.      **Excessive Number of Stages**

112.    However, it is the number of *stages* of Mohs surgery that is particularly "over the top".

113.    Each stage ( or "level") is a layer of specimen. One normally only proceeds to take off an additional stage/level if the testing shows that there is cancer in the prior level.

114.    But Dr. Proctor is routinely billing Medicare for three to four stages (i.e., levels) of Mohs surgery for the vast majority of Mohs surgeries allegedly performed.

115.    While it is Ms. Wildes' direct observation that Dr. Proctor performed three (3) or four (4) stages the vast majority of the time, Dr. Becker's estimate, with a similar conclusion, is based on the patient records that he has reviewed. Dr. Becker has concluded that, in these cases, Dr. Proctor performed Mohs surgery in three (3) stages approximately sixty percent (60%) of the time, and performed Mohs surgery in four (4) stages approximately thirty (30%) of the time. Only about ten percent (10%) were completed in one (1) or two (2) stages. (As noted above, Medicare separately reimburses for each stage of Mohs surgery performed in removing cancer. Hence, the more stages of Mohs surgery that are performed, the higher the reimbursement from Medicare.)

116.    This is far outside the norm, which is for one to two stages of Mohs surgery. One cannot justify performing three to four stages of Mohs surgery on the overwhelming majority of cancerous lesions—let alone on non-cancerous lesions.

117.    In Dr. Becker's own professional experience, one or two stages is often required, but rarely three, and very rarely four, and certainly not three or four for the vast majority of cases, as executed by Dr. Proctor.

118.    Hence, Dr. Proctor is not only performing far more Mohs surgeries than normal and medically necessary, but with each, he is cutting more stages/levels than normal and

necessary. So there is a multiplier effect that is huge, enriching to Dr. Proctor, and depriving to the U.S. Treasury.

119. It is not that Dr. Proctor is an unskilled surgeon. Rather, he is carrying out these additional stages by design, based on Ms. Wildes' observations and Dr. Becker's knowledge and expertise: he intentionally makes shallow cuts into the skin cancer (or non-cancerous skin), often before performing any debulking (removal of as much of it as possible, i.e., removal of the bulk of it), which leaves tissue with positive margins (or other non-cancerous skin) that unnecessarily "require" further excision (i.e., a second, third or fourth stage). Stated differently, Dr. Proctor is purposely cutting off such small, shallow pieces in each stage, that he knows there will be cancer in the next stage. That means that he is making many more cuts into patients' faces than necessary.

120. An ethical and compliant Mohs surgeon would first debulk the skin cancer; there is not a Mohs surgery charge for debulking. Only after debulking would the first stage of Mohs surgery commence. In the first stage, the Mohs surgeon should take off a generous portion, to attempt to excise it all. (Bear in mind that, with respect to the word "generous", the Mohs surgeon is dealing with very small portions in the first place, measuring in millimeters.) He should not take off a minimal amount, which would practically guarantee that more tissue has to be removed in a second or more stages. If the next stage were found to be positive, the Mohs surgeon normally would take off an even more generous section to be sure it was completely removed. Again, Dr. Proctor is taking off a tiny bit to ensure that cancer will remain, in order to bill for more levels to be removed.

121. Ms. Wildes is certain that Dr. Proctor has performed all of these unnecessary Mohs surgeries and stages—as opposed to pretending he had, and billing for it—because she frequently actually observed him performing them, and personally performed the cutting, tissue labeling, and making of the cold slides (both cutting the slides for the tissue excisions and subsequently placing the excised tissue on the slides) for almost each and every stage that was performed while she worked for him over a period of approximately eight years and three months.

122. Ms. Wildes often observed part or all of the Mohs surgeries taking place. She often stood only a few feet away. She often heard Dr. Proctor make statements to the patient akin to:

18

"Oh, I see a couple more places [on your face].  Let me go ahead and get a biopsy on this one so that you don't have to come back.  We'll go ahead and do it here today so you don't have to come back again."

123.   Because many patients traveled to Dr. Proctor's office from one to three hours away, he frequently made such statements to emphasize that the patient could eliminate future inconvenience by taking care of the concocted issues all in that one day.

124.   For Ms. Wildes, the basic routine was that Dr. Proctor would cut off the tissue, make a Mohs map, give it and one piece of tissue for each lesion to Ms. Wildes, who would give it an accession number and record it into a log book, freeze the tissue, cut the section, mount it on a slide, stain it, cover-slip it, and then present it to Dr. Proctor with the Mohs map that he had presented to her.  She assigned a letter to each lesion, and a number for each stage.  She made one slide for each piece of tissue.  For example, if a patient had four (4) Mohs surgeries, with four (4) stages in each surgery, sixteen (16) slides would be made:

| 1ST Stage | 2nd Stage | 3rd Stage | 4th Stage |
|---|---|---|---|
| A-1 | A-2 | A-3 | A-4 |
| B-1 | B-2 | B-3 | B-4 |
| C-1 | C-2 | C-3 | C-4 |
| D-1 | D-2 | D-3 | D-4 |

125.   Dr. Proctor would then perform another stage/excise another level of tissue, supposedly if he found that the margins were not clear of cancer.

### c.   Bogus Reconstructions/Skin Flaps

126.   Furthermore, Dr. Proctor is also greatly enhancing the Government's losses by billing for medically unnecessary reconstructions/skin flaps to allegedly close up surgical defects left by the surgeries.

127.   At first blush, Dr. Proctor appears to suffer from an acute case of "flapophilia":  an affinity for excessively making flaps to repair surgical defects, in lieu of performing primary closures or secondary intention healing.[1]

---

[1] There are various types of flaps, which may be classified by the types of tissue contained in the flap, the area of recruitment, the blood supply, or the method of transfer.  For example, those

128.    In virtually every case that Dr. Becker has reviewed, Dr. Proctor claims to have performed a flap, which is statistically illogical. The truth is that Dr. Proctor is most frequently doing routine closures and/or no closures at all, but billing Medicare for performing flaps and complex flaps. Obviously, such repairs are needed in some complex cases, but it is clearly excessive when a Mohs surgeon repairs a majority of defects with flaps. The vast majority of Mohs surgery defects may be repaired by simple side-to-side closure; flaps should be performed only when necessary. With routine closures, fewer complications are normally encountered and the cosmetic result is normally superior.

129.    Reconstruction of multiple complex defects, plus performance of several multi-stage Mohs surgeries, should take all day—for even the most highly skilled Mohs surgeons. It is impossible that Dr. Proctor was truly completing multiple flaps on Mohs patients by 3 pm, which is the latest time that Dr. Proctor normally finished up work on Mohs patients each day.

130.    Other personal observations by Ms. Wildes also highlight the fraudulent flaps: Through the years, she observed thousands of Dr. Proctor's Mohs surgery patients. At various times, Ms. Wildes saw patients in the hallway, in the surgery room, and in other areas of Dr. Proctor's office. She could see, from looking at their faces, how often defects had been closed up with or without sutures, and whether or not they were bandaged up. In her estimation, approximately thirty-five percent (35%) of these patients' surgeries involved such small cuts that sutures were not even used. That is, closures of these patients' surgical defects were "by secondary intention": only ointment was used on the surgical defect. Most of the closures were simple closures (with sutures and ointment), she observed. It was not more than once every two weeks that Ms. Wildes saw any evidence that a complex skin flap had been performed on a patient—this is quite apparent when one looks at a patient (in contrast to a small local flap).

131.    Similarly, patients often underwent Mohs surgeries, but left the office without bandages. None of this is to say that Ms. Wildes observed every Mohs patient after surgery.

---

classified by area of recruitment are local flaps (originating from the tissue adjacent to the defect), regional flaps (deriving from sites not adjacent to the defect, but found within the same anatomic area), and distant flaps (deriving from some other area of the body).

However, she did observe well over a thousand patients after Mohs surgery, through the many years she worked for Dr. Proctor.

132.   Ms. Wildes' observations not only cast serious doubt on the number of flaps that Dr. Proctor performed, but also cast serious doubt on the number of Mohs surgeries that were truly complex/multi-stage. With multi-stage Mohs surgeries and flaps, sutures *would* be needed. And bandages would not be unexpected. (The lack of bandages is not necessarily a sign of the lack of Mohs surgeries. Defects can be closed with sutures and ointment, but without bandages. For smaller defects, sutures may not be required at all after Mohs surgery. Further, because lesions often bleed into each other, one would not necessarily expect to see, for example, 4 bandages for 4 Mohs surgeries. On the other hand, Ms. Wildes only saw a bandage or two on a few patients per week, out of the approximately 18 Mohs patients per week. Ms. Wildes believes she would have seen a lot more bandages had more true Mohs surgeries and true flaps been performed by Dr. Proctor. Again, this is not to say that she saw every patient post-surgically.)

133.   Further proof concerning the medically unnecessary flaps is the limited amount of time that was actually used to perform the Mohs surgeries and, allegedly, the flaps. For *each* patient undergoing complex, multi-stage Mohs surgeries, with flaps, *an entire day* of surgery would have been required. This is complex, time-consuming surgery. However, Ms. Wildes observed that virtually all patients' procedures were completed within four (4) hours, by 1pm, or at very latest and very rarely, by 3 pm.

134.   It is simply impossible that Dr. Proctor was completing the advanced procedures he has claimed within the time allotments he utilized. This is especially true, of course, where Dr. Proctor's records show that he allegedly performed multiple Mohs surgeries and multiple complex flaps in one day. One cannot perform four or five multi-stage Mohs surgeries, with two or three of them involving flaps, in one day, and do any other complex cases that day.

### d.   Surgery Center Fees

135.   Dr. Proctor is also charging expensive surgical center fees by falsely describing the vast majority of defects as non-contiguous.

136.   For example, Dr. Proctor is falsely describing a defect as being two noncontiguous defects, thus needing two flaps, and then charging two surgery center fees; in truth, they

are contiguous (one defect), or the second defect is non-existent.  The second surgery center fee is thus fraudulent.

137.    Even more significantly, the surgery center fees are also fraudulent, in the first place, when charged for any Mohs surgery or flap that was not medically necessary.  Dr. Proctor is charging a surgery center fee for each and every Mohs surgery.  For example, with respect to patient JJ, these charges and reimbursements were made:

| Dates of Service | Services Provided | Amount Charged | Medicare Approved | Medicare Paid Provider |
|---|---|---|---|---|
| Claim number XX<br>Grove Place Surgery Center, Suite B,<br>1325 36th Street, Vero Beach, FL 32960-4848<br>Referred by: Dr. Proctor, Donald C., M.D. | | | | |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14060-SG) surgery center fee | $1,300.00 | $512.18 | $409.74 |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14041-59SG51) surgery center fee | $1,300.00 | $256.09 | $204.87 |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14041-59SG51) surgery center fee | $1,200.00 | $223.96 | $179.17 |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14041-59SG51) surgery center fee | $1,200.00 | $223.96 | $179.17 |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14041-59SG51) surgery center fee | $1,200.00 | $223.96 | $179.17 |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14041-59SG51) surgery center fee | $1,200.00 | $223.96 | $179.17 |
| xx/xx/xx | 1 Skin tissue rearrangement<br>(14041-59SG51) surgery center fee | $1,200.00 | $223.96 | $179.17 |
| | **Claim Total** | **$8,600.00** | **$1,888.07** | **$1,510.46** |

138.    With respect to the above-described patient, Medicare paid Dr. Proctor's surgery center $1,888.07 for seven (7) Mohs surgeries that were medically unnecessary.

   **5.    Specific Patient Cases Show the Fraud and the Cover-Up.**

139.    Proof of Dr. Proctor's Medicare fraud is based not only upon Ms. Wildes' knowledge as Dr. Proctor's histology technician for approximately eight (8) years, but also through Dr. Becker's evaluation of medical reports that Dr. Proctor sent him as follow-up's to patient referrals from Dr. Becker to Dr. Proctor.  (Further, Dr. Becker has reached this

conclusion from interviewing some of these patients, through discussions with patients—including patient BB—and of course by confirming the fraud with Ms. Wildes.)

140.    Specifically, Dr. Becker has referred a number of patients to Dr. Proctor for Mohs surgery in recent years, specifically patients AA, BB, CC, DD, EE, FF, GG and HH.  (II also was a patient of both Dr. Proctor's and Dr. Becker's, but not through a referral by Dr. Becker.)

141.    The copies of medical records that Dr. Becker possesses concerning these patients, clearly show that Dr. Proctor is using very sloppy, fraudulent medical documentation to conceal the fact that he is not performing the number and extent of Mohs surgeries he has claimed to have performed.  For example, Dr. Proctor has described cancerous lesion dimensions, alleged defect dimensions left by the surgeries, and skin flaps to close those claimed defects, that could not possibly have existed:  there is not sufficient tissue in the areas of the face at issue to do so.

142.    These reports are summarized below with respect to each patient:

143.    <u>AA</u>

Dr. Becker sent this patient to Dr. Proctor for a biopsy-proven, small, recurring basal cell carcinoma ("BCC") on her nose that Dr. Becker did the biopsy on.  There was a small defect, which was where the lesion was, plus the biopsy site.  She had no other lesions—just healthy skin, as proven by the photographs that Dr. Becker's staff took of the nose, showing the lesion after biopsy (but before Mohs surgery) with no other lesions.  Dr. Proctor justifiably performed Mohs surgery on that lesion A, but claimed there was another lesion B above it, in the supratip area (just above the tip, where the first lesion was), and performed Mohs surgery there, too.  Dr. Proctor claimed two defects, measuring 1.8 x 1.1 cm and 1.4 x 1.0 cm, and claims that they were noncontiguous.  If one looks at the diagrams, one can see that total defects of almost the entire skin of the lower half of the nose are allegedly involved.  Dr. Proctor claimed in his written report (as he always does) that tissue was "brought in laterally" and that burrows triangles were removed. This is nearly impossible with these sized defects of the nose.  Some sort of

nasolabial (melolabial) would have been required, or a large skin graft.[2]  In the post-operative photographs—also taken by Dr. Becker's staff—there is no evidence of a donor-site scar from getting tissue off of the nose.  With this photographic proof, it is clear that there were instances in which Dr. Proctor performed Mohs surgery on healthy skin, and made ridiculous claims to attempt to cover his tracks.

144.  <u>BB</u>

Dr. Proctor claimed that five (5) Mohs surgeries were done on this patient.  The resulting defects on the right lateral nose would have combined to be at least 4 cm. and, if noncontiguous as claimed, would have been even larger.  It would be nearly impossible to "move tissue in from lateral in an adjacent tissue transfer" without a major right cheek flap or forehead flap.  However, it is claimed that two large cheek defects were also reconstructed with "lateral tissue".  This is also impossible.  In addition, Dr. Proctor claimed to have reconstructed two additional defects (one of the right lower eyelid and the other of the right medial cheek).  He claimed that these defects resulted from the reconstruction of the two nose defects.  Usually, the reconstruction of the donor-site defects is included in the price of the primary reconstruction, so this appears to be double charging—not only of surgeon's fees but also of the facility fees.  Another major problem with this case is the alleged reconstruction of the 3.4 x 3.0 cm defect of the right forehead.  This sized defect would require a very large temple, cheek, or forehead flap.  When Dr. Becker saw BB post-operatively, there was no evidence of a large reconstruction and, in fact, the patient told Dr. Becker that he had had no large reconstruction in the area.  Dr. Becker has copies of EOBs pertaining to treatment of BB.

145.  <u>CC</u>

Lesions A and C, as described, could not possibly have been noncontiguous and, even if they were, it is extremely unlikely that there is enough tissue in the left temple to reconstruct the defects without a very large, complicated flap procedure, which was certainly not described.  Defect B is described as a large (1.8 x 1.7 cm) defect to the left helical rim of the ear.  Dr. Proctor wrote that he brought in tissue from lateral to the

---

[2] Skin grafting is a common surgical procedure performed to achieve wound coverage when other closure techniques are either inappropriate or cannot be performed optimally.  It involves the removal of skin from its native blood supply at the donor site and replacing it in the wound bed of the defect site.

helical rim, but there is no such tissue, only post-auricular skin. To reconstruct a defect of this great size would require a post-auricular flap and probably a cartilage graft. This is a complex, two- (or more) stage procedure, which obviously was not done.

146.   DD

The operative report (not the Mohs report) reveals the size and locations of the defects. Considering the surgical diagram, there necessarily would have been some overlap of the resulting defect; they could not have all been noncontiguous. Additionally, to reconstruct these defects would have involved a large cheek flap, or more probably a large cheek-neck flap. If the large C defect were reconstructed with "lateral tissue", there simply would be no tissue left for the reconstruction of the D defect. The same applies to the B defect: if lateral tissue was really used to reconstruct it, there would be no tissue to reconstruct defect A. Hence, it is impossible that the Mohs surgery truly transpired as it was described in Dr. Proctor's operative notes. Hence, it is impossible that Mohs surgery reconstruction truly transpired as it was described.

147.   EE

The operative report (not the Mohs report) and the diagram on this patient indicate many alleged problems. These have to be defects, some of which are contiguous by definition, as they are stated to be. There is not enough tissue laterally to be brought in to reconstruct these, even if they had been done in one flap, much less several flaps as claimed. Additionally, a 2.0 x 1.4 cm defect of the mid upper eyelid (defect A) constitutes almost all of the central skin of the upper lid. There is no tissue which could have been brought in from lateral because it would have been all removed with the excisions of the other lesions (i.e., defects B, C, and D). The only way a defect of this size of the mid-upper eyelid could have been reconstructed is with a large skin graft or a transposition flap from the lower eyelid (a very complex procedure)—neither of which were done, obviously.

148.   FF

This is one of the most egregious of the claimed noncontiguous defects cases (of the set of copies of medical records that Dr. Becker possesses). Looking at the operative report (not the Mohs report) and the surgical diagram, it is obvious that if what is described were true, all of these defects are contiguous with each other. The reconstruction of the

25

resulting, single, enormous defect would have been a herculean task, involving a Krapanzic flap, mucosal flaps and perhaps also cheek flap. What Dr. Proctor in fact performed is not known, but what is described can only be regarded as fiction. By claiming noncontiguous defects, when in fact they were contiguous, Dr. Proctor was charging extra facility fees that would not normally be covered.

149.   GG

When one reads the operative report and the surgical diagram, the most glaring inconsistency in this case is defect B, as a 1.4 x 1.6 cm defect of the medial canthus. The claim that "lateral tissue was advanced into the medial defect" is impossible. There is no tissue lateral to such a defect except the upper and lower eyelids, which cannot be advanced medially. Defects A and C would have required formal flap procedures, which were not described in the operative report. Dr. Proctor claims to have done two (2) four (4)-stage Mohs, one (1) three (3)-stage Mohs, and one (1) two (2)-stage Mohs, to have reconstructed a large forehead defect, brow defect, a moderate-sized left lower eyelid defect, a cheek defect, a moderate-sized left lateral nose defect—and a medial canthus defect with "lateral tissue" (as noted above, impossible). These reconstructions would have left virtually no time to do much else that day—certainly not the multiple, multiple-stage Mohs surgeries claimed.

150.   HH

The claimed 3.0 x 3.4 cm defect of the mid-forehead is a very large defect. It would have required undermining the entire forehead and harvesting skin from both sides. However, on the right side, there is another defect which required "lateral tissue", so there would be no tissue remaining on the right side to work with. What Dr. Proctor claims to have dome is impossible or virtually impossible. The large defect of the left lower eyelid, defect E, would have required a large rotation cheek flap with closure of a major donor site, which is not described and presumably was not truly done. From a time perspective, it is extremely unlikely that Dr. Proctor could have performed all of the work on this patient that was claimed, plus work on other patients.

151.   II

The case of patient II shows that there were instances in which Dr. Proctor was actually performing Mohs surgeries on patients with nothing more than actinic keratosis.[3] The standard procedure for removing actinic keratosis is to freeze it off with a zap of liquid nitrogen—a very effective and low-cost procedure compared to expensive, medically unnecessary, multiple-stage Mohs surgery, coupled with flap reconstruction and a facility fee. If a Mohs surgeon suspected that a case of actinic keratosis were cancerous, the standard of care clearly requires the Mohs surgeon to do a biopsy to verify that it is cancerous, *prior to* performing Mohs surgery. However, it was often Dr. Proctor's practice to proceed immediately to Mohs surgery, without first obtaining biopsy results. In the case of this patient, Dr. Proctor did precisely that. Dr. Proctor stated in his notes that he would biopsy additional lesions and would conduct Mohs surgery in the event they turned out to be cancerous. They turned out to be actinic keratosis, but he proceeded with Mohs surgery any way. Thus, he was clearly performing Mohs surgery on benign lesions. When Dr. Proctor sent the first section to the pathologist, the pathologist reported back with a couple of them and stated, in essence, "Actinic keratosis: cannot rule out squamous cell carcinoma." But even with that, one would not expect the patient to need three or more stages of Mohs surgery; only one stage would be required. What Dr. Proctor was doing under these circumstances was totally unnecessary. But the records pertaining to II are even more telling yet: PA JO allegedly had seven (7) lesions. One of them was definitely a benign lesion—nothing more than actinic keratosis ("AK"),

---

[3] "Actinic keratosis (AK or solar keratosis) represents a focal area of dysplastic keratinocytes caused by UV radiation. The dysplastic cells are typically located in the bottom third of the epidermis and neither fill the epidermis nor extend down adenexal structures or into the dermis. AKs are a common condition and represent the second most common reason a patient visits a dermatologist....AKs often present in sun-exposed skin as rough, pink, scaly papules, and plaques. They are usually asymptomatic, but can become inflamed and irritated, often exacerbated with excessive ultraviolet exposure. Some patients complain of a burning or stinging pain. The lesions can be of any size, but are frequently less than 5 mm....A palpable, dermal, painful, or ulcerated lesion should alert the physician to a more advanced disease process such as SCC or SCC in situ (SCCis)....Overall, the majority of AKs will not progress. However, in individuals with many AKs, probability and clinical experience shows that these patients will most likely develop SCCis/SCC in the course of their management." Erin J. Allen, M.D., Summer R. Youker, M.D., & Scott W. Fosko, M.D., "Diagnosis & Treatment of Cutaneous Malignancies of the Face", in J. Regan Thomas, M.D., Advanced Therapy in Facial Plastic & Reconstructive Surgery, at 611-12 (People's Medical Publishing House-USA, 2010).

and yet he still performed multi-stage Mohs surgery. The pathologist concluded that another lesion was carcinoma in situ—meaning that the cancer lay just on top of the skin. Thus, only one stage of Mohs surgery should have been needed. But Dr. Proctor took three or four stages/levels on each of these lesions. Hence, many of these stages were medically unnecessary. There are other problems with this case: The three (3) claimed large defects of the left check (defects A, B and C), as described, would have removed at least half of the skin on that side of the face. The reconstruction of these defects would have required an enormous cervicofacial flap (a flap of check and neck skin), which was obviously not done, as the patient told Dr. Becker in person. The same problem exists with defects D, E, and F. There is not enough tissue to be brought in laterally for these. There is also another problem with defect E: this was not a Mohs defect, but it is claimed to be a defect from the closure of defect D, and it is claimed to be noncontiguous. By definition, it must have been contiguous, and should have been covered in the closure of the donor site D.

### THE ALTERING OF SLIDES

152.   Dr. Proctor had a policy and practice of regularly altering slides: Whenever Ms. Wildes prepared biopsy slides for review by a pathologist, one of Dr. Proctor's assistants, Bonnie Watson, who died in a motorcycle accident in July 2009, would receive the written pathology reports a few days later. Ms. Watson would read them, and if they did not line up properly, Ms. Watson would alter the slides by erasing and changing numbers and/or names: re-labeling the slides. The numbers pertained to different accessions, lesions and stages of Mohs surgery.

153.   There was no legitimate reason to change these labels. Ms. Wildes had originally filed the slides under their respective case/patient numbers, so there would have been no reason to change the numbers. The labels were in a small area on the top of the slides; the tissue was on the bottom portion of the slides, with cover slips. Ms. Wildes observed Ms. Watson doing this approximately two to three times per week.

154.   Ms. Wildes often saw this take place from a short distance (within 10 feet). Ms. Watson did this in a small work area near where Dr. Proctor reads his microscope, in the surgery center. Ms. Watson also would actually enter "Ms. Wildes'" area of the laboratory, where she worked and the slides were stored in drawers in a slide cabinet. Ms. Watson

would remove them right in front of Ms. Wildes.  Ms. Watson typically spent about half an hour reviewing those pathology reports, when they came in, approximately three times per week.

155.    About one month before Ms. Watson died, Ms. Wildes asked her if the same improprieties were taking place at Dr. Proctor's office *after* Ms. Wildes stopped working there.  Ms. Watson answered yes, that nothing had changed.

### THE HIGH NUMBER OF FRAUDULENT MOHS SURGERIES, STAGES, FLAPS AND SURGERY CENTER FEES

156.    Dr. Proctor not only has engaged in the fraud for at least the last thirteen (13) years, performing an astounding number of Mohs surgeries in three or four stages, Dr. Proctor also has charged for skin flaps and surgical center fees (the vast majority of which are medically unnecessary, because they are "products" of the unnecessary Mohs surgeries).

157.    With respect to medically unnecessary Mohs surgeries and stages performed by Dr. Proctor, the numbers are staggering:  In the average workweek, Dr. Proctor performed Mohs surgeries on an average of approximately four-and-a-half (4.5) patients per day, four (4) times per week (normally Monday through Thursday), which amounts to approximately eighteen (18) patients per workweek.

158.    Based also on a conservative estimate, Dr. Proctor has performed an average of six (6) Mohs surgeries on each of these patients:  an average of two (2) that were necessary, and another four (4) that were unnecessary.  (As before, this estimate factors in the fact that, approximately once a week, Dr. Proctor also would "work up" a case in which he performed an average of approximately twelve (12) Mohs surgeries on a patient.  But for such a weekly, enormous work-up, the averages would be lower.)  Dr. Proctor is performing an average of approximately 3.5 stages in each Mohs surgery, but only 1.5 are necessary, on average.  Thus, for each Mohs surgery that was necessary, there were still 2 stages (3.5 minus 1.5) that were unnecessary.  For an entire Mohs surgery that was unnecessary, of course, all 3.5 stages were unnecessary.

159.    Presuming conservatively that Dr. Proctor took off eight (8) weeks per year for vacations, holidays and sick days (he indeed took off a considerable amount of time), that leaves forty-four (44) weeks per year that he was working and performing Mohs surgeries.  Over the 8.25 years that Ms. Wildes worked for Dr. Proctor, that amounts to 363 weeks (8.25 years x 44 weeks = 363 weeks).  Over a ten (10)-year period (corresponding to the

False Claims Act's statute of repose), that amounts to 440 weeks. The 8.25-year period will be utilized, to remain conservative.

|   | | | |
|---|---|---|---|
| | 4 unnecessary surgeries x 3.5 stages per surgery | = | 14 unnecessary stages |
| + | 2 necessary surgeries x 2 unnecessary stages | = | 4 unnecessary stages |

18 unnecessary stages per patient

160. Eighteen (18) unnecessary stages per patient x eighteen (18) patients per week x 363 weeks (8.25 years) = 117,612 unnecessary stages of Mohs surgery.

161. With a large percentage of the unnecessary Mohs surgeries, of which there have been approximately 26,136 over the last eight years and three months (4 unnecessary surgeries per patient x 18 patients per week x 363 weeks in 8.25 years = 26,136), there have been corresponding, unnecessary flap and complex flap charges, as well as surgery center charges.

**COUNT 1 of 2:  Federal Civil False Claims Act, as amended by FERA**

162. Relators reallege the allegations of paragraphs 1 though 161 as if fully set forth herein.

163. This is a civil action by Relators, acting on behalf of the Government, against all Defendants.

164. All Defendants have knowingly submitted false claims for payment, or caused false claims for payment to be submitted, to officials of the Government, including the Medicare Program, in violation of **31 U.S.C. § 3729(a)(1).**

165. As a direct and proximate result of Defendants' conduct, the Government has suffered actual damages, having made payments and/or reimbursements.

166. All Defendants, by and through Dr. Proctor and/or one or more agents or employees, knowingly made, used, or caused to be presented, to an officer of the Government, false or fraudulent claims for payment, reimbursement, or approval.

167. Defendants, by and through their officers, agents, and/or employees, authorized these agents to take the actions set forth above.

168. WHEREFORE, Relators Ferdinand Becker, MD, and Linda Wildes, on behalf of themselves and the Government, pray that after due proceedings:

30

- This Court enter judgment against Donald Collier Proctor, Jr., M.D.; Proctor, Baggett & Yoon, M.D., P.A.; Face Center of Vero, PLC; Grove Place Surgery Center, L.L.C.; and ENT Properties, L.L.C.; in an amount equal to three times the amount of damages the Government has sustained, plus a civil penalty of $5,500.00 to $11,000.00 for each and every false claim that was presented to the Government;
- This Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act, ordering Defendants to cease and desist from violating the statute;
- The Government and Relators be awarded all reasonable attorneys' fees, costs and expenses as incurred;
- The Government and Relators be awarded pre-judgment and post-judgment interest;
- The Government and Relators recover any and all relief, both at law and in equity, to which they may reasonably appear entitled; and
- The Government and Relators each be awarded the maximum amount and receive all of the rights and benefits allowed by the FCA and the Fraud Enforcement & Recovery Act of 2009 (FERA).

**COUNT 2 of 2: Federal Civil False Claims Act, as amended by FERA**

169. Relators reallege the allegations of paragraphs 1 though 161 as if fully set forth herein.

170. This is a civil action by Relators, acting on behalf of the Government, against all Defendants.

171. All Defendants, by and through one or more officers, agents, and/or employees, knowingly made, used or caused to be made or used, false records or statements, to get false or fraudulent claims paid, reimbursed or approved, in violation of **31 U.S.C. § 3729(a)(2).**

172. As a direct and proximate result of Defendants' conduct, the Government has suffered actual damages, having made payments and/or reimbursements.

173. All Defendants, by and through Dr. Proctor and/or one or more agents or employees, knowingly made, used, or caused to be presented, to an officer of the Government, false or fraudulent claims for payment, reimbursement, or approval.

174. Defendants, by and through their officers, agents, and/or employees, authorized these agents to take the actions set forth above.

175.   WHEREFORE, Relators Ferdinand Becker, MD, and Linda Wildes, on behalf of
themselves and the Government, pray that after due proceedings:

- This Court enter judgment against Donald Collier Proctor, Jr., M.D.; Proctor, Baggett & Yoon, M.D., P.A.; Face Center of Vero, PLC; Grove Place Surgery Center, L.L.C.; and ENT Properties, L.L.C.; in an amount equal to three times the amount of damages the Government has sustained, plus a civil penalty of $5,500.00 to $11,000.00 for each and every false claim that was presented to the Government;

- This Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act, ordering Defendants to cease and desist from violating the statute;

- The Government and Relators be awarded all reasonable attorneys' fees, costs and expenses as incurred;

- The Government and Relators be awarded pre-judgment and post-judgment interest;

- The Government and Relators recover any and all relief, both at law and in equity, to which they may reasonably appear entitled; and

- The Government and Relators each be awarded the maximum amount and receive all of the rights and benefits allowed by the FCA and the Fraud Enforcement & Recovery Act of 2009 (FERA).

**JURY REQUEST**

176.   Relators request a jury trial for all issues so triable.

Respectfully submitted:

s/ Steven F. Grover

_____

Steven F. Grover, Esq.
Grover Whistleblower
& Employee Rights Center
One East Broward Blvd., Suite 700
Fort Lauderdale, FL 33301
Tel. 954-356-0005
Fax 954-356-0010
E-mail: lawhelp@earthlink.net
*Counsel for Relators*

Becker.Complaint.FINAL.051811

32